Case No. 12-60682

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

TODD W. ION                                                        Appellant

V.

CHEVRON USA, INC.                                                   Appellee

Appeal from the United States District Court
Southern District of Mississippi
Jackson Division
No. 1:11- cv- 24 LG-RHW

---

## BRIEF of the APPELLANT

---

Mike Farrell

Miss. Bar No. 5147
Mike Farrell, PLLC
Regions Plaza, Suite 2180
210 E. Capitol Street
Jackson, Mississippi 39201
Tel: 601-948-8030

*Attorney for Appellant*

Case No. 12-60682

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

TODD W. ION                                                                    Appellant

V.

CHEVRON USA, INC.                                                              Appellee

Appeal from the United States District Court
Southern District of Mississippi
Jackson Division
No. 1:11- cv - 124 LG-RHW

---

**Brief of the Appellant**

---

## RULE 28.2.1 CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Todd Ion
2. Mike Farrell
3. Chevron USA, Inc.
4. Pat Buchanan
5. Brown Buchanan, PA

*/s/ Mike Farrell*
Mike Farrell

## Statement Regarding Oral Argument

The appellant submits that oral argument may be helpful in this case.

# TABLE OF CONTENTS

Certificate of Interested Persons .......................................................................... 2

Statement Concerning Oral Argument............................................................... 3

Table of Contents................................................................................................... 4

Table of Authorities .............................................................................................. 5

I.      Jurisdictional Statement............................................................................ 6

II.     Statement of the Issues .............................................................................. 6

III.    Statement of the Case................................................................................ 6

IV.     Statement of the Facts................................................................................ 7

 V.     Course of Proceedings Below ............................................................... 16

VI.     Summary of the Arguments.................................................................... 16

VII.    Standard of Review.................................................................................. 16

VIII.   Arguments................................................................................................. 17

        A.      Mixed-Motive Case ...................................................................... 17

        B.      Proof of the Affirmative Defense: Reliance on Reports .......... 19

        C.      Evidence Necessary to Prove the Affirmative Defense .......... 24

        D.      The Reports Involved Independent FMLA violations ............ 25

                1. The First Report...................................................................... 26

                2. The Second Report ................................................................. 28

IX.     Conclusion ................................................................................................ 31

Certificate of Service ............................................................................................ 32

Certificate of Compliance.................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**

Hopkins v Price Waterhouse, 490 U S 228, 109 S.Ct.1775 (1989) ........................... 22

Jackson v Cal-Western Packaging Corp., 602 F 3d 374 (5th Cir. 2010) ................... 19

McDonnell Douglas v Green, 411 U S 792 (1973).................................... 15, 16, 17, 19

McKennon v. Nashville Banner Pub. Co., 513 U.S. 352 (1995)......................... 22, 23

Murillo v. Rite Stuff Foods, 65 Cal.App.4th 833, 77 Cal.Rptr.2d 12 (1998) ......... 24

Richardson vs. Monitronics Int'l, Inc., 434 F.3d 327 (5th Cir. 2005) ...........16, 20, 23


**Statutes**

29 USC § 2613(a)(2) ...............................................................................26, 28, 29


**Code of Federal Regulations**

29 CFR § 825.300(c)(5) ................................................................................. 29

29 CFR  § 825.306(c) ..................................................................................... 29

29 CFR § 825.300(c) ................................................................................27, 30

29 CFR § 825.306(a) ..................................................................................... 27

29 CFR § 825.306(b)...................................................................................... 28

29 CFR § 825.307(b)...................................................................................... 26

## I.     Jurisdictional Statement

The jurisdiction of the district court was based on 28 U.S.C. § 1331.

## II.     Statement of the Issues

1.  Did the district court err in holding that the same proof that satisfied the employer's burden at Step 2 of the McDonnel Douglas analysis is also sufficient to prove the employer's affirmative defense at Step 4 of the modified analysis ?

2.  Did the district court err in finding that proof of a good faith reliance on reports from co-workers was sufficient to prove that Chevron would have fired Ion in the absence of unlawful animus ?

3. Did the district court properly apply Step 4 analysis in a mixed-motive case ?

4.  Does this record have any evidence that Chevron would have fired the plaintiff even if the unlawful retaliatory reason is not considered  ?

## III.     Statement of the Case

The plaintiff sought leave or a reduced work schedule to deal with marital and child care issues.  That request was not protected by the FMLA.  However, the ongoing stress due to those issues as well as the subsequent stressors at work lead to a serious health condition that was protected.  Chevron interfered with his FMLA rights by terminating him for taking that leave.  This case involves the type of proof necessary in a mixed-motive case for an employer to prove that it would have fired the plaintiff even if the unlawful retaliatory motive is removed from consideration.

IV.    **Statement of the Facts.**

The plaintiff's response contained 57 paragraphs of facts.  R. 255-261.

Those facts were verified by Ion's declaration.  R. 308.

**Background.**  The plaintiff, Todd Ion, worked as a chemist for the Chevron

refinery in Pascagoula.  R. 255 ¶ 1.  In the fall of 2008, personal life unraveled when

his wife left him and moved to Kentucky with their five-year-old son. The plaintiff

started traveling to Kentucky on weekends to spend time with his son.  The plaintiff

advised his supervisor Vince Dressler of his separation and his weekend trips. R. 255

¶ 2.

On December 16, 2008, the plaintiff met with his supervisor (Vince Dressler)

and his departmental manager (Steve Ogborn) for a pre-evaluation conference.  This

conference was a prelude to an annual evaluation 30 days later.  Ogborn and Dressler

mentioned the issue of his weekend trips to Kentucky.  R. 255-56 ¶ 3.

**The Plaintiff's Request for Personal Leave or a Reduced Schedule.**  The

plaintiff realized that he needed some relief to handle the conflicting demands

between his job and his personal situation. He was pleased to discover that Chevron

has a policy that allows for a leave or a modified work schedule for an employee going

through "a life-changing event" like a divorce.  R. 256 ¶ 5.  However, the plaintiff also

knew it was not an opportune time to ask for an accommodation.  Everybody in the

chemistry lab was working on an audit scheduled for the following March.  Further,

another chemist (Pam Miller) had already announced that she would be taking FMLA maternity leave the following August. R. 256 ¶ 7.

The plaintiff asked his supervisor, Vince Dressler, for advice on how to approach Ogborn about such a request.  Ogborn could be difficult and had to be approached delicately.  R. 256 ¶ 6.

Ogborn and Dressler met with the plaintiff on January 28, 2009, for his annual review.  The plaintiff thought the meeting went well.  Ogborn acknowledged that he was aware of the plaintiff's marital difficulties.  R. 256 ¶ 8.  Ogborn said we don't have any negative issues to discuss; we don't need to discuss anything from the December 16 meeting.   R. 256 ¶ 9.

Ion asked Ogburn for a separate meeting to discuss a leave or a modified work schedule.  Ogborn was receptive to such a meeting at a later date. R. 256 ¶ 9.

In early February 2009, the plaintiff was awarded custody of his son. The plaintiff returned him from Kentucky and enrolled him in a daycare that was close to the Chevron plant.  To reduce his commuting time, the plaintiff put his house (in Daphne, Alabama) on the market and rented a house closer to the plant.  His son was not adjusting.  He cried at lot at the day care and did not eat.  Ion decided to spend his own lunch hour at the day care to encourage his son to eat and to help him adjust. R. 256 ¶ 10.

On February 5, 2009, the plaintiff had a short conversation with Steve Ogborn during a break in an all-day departmental meeting.  Ion brought him up to date on the above developments. R. 256 ¶ 10.

Ion also asked for a meeting the following Monday to discuss his need for leave or modified schedule.  Ogborn agreed to meet.  R. 257 ¶ 11.  Ion then asked to be excused from the departmental meeting so he could join his son for lunch. Ogborn readily gave him permission. Ion returned to the meeting more than an hour later.  R. 257 ¶ 12.

On Monday, February 9, 2009, Ogborn canceled the meeting to discuss Ion's request.  Two more meeting were scheduled only to be cancelled by Ogborn. R. 257 ¶ 13.  Ogborn finally told Ion that they would have to schedule a meeting sometime after the departmental audit which was scheduled for March 9 - 13, 2009.  R. 257 ¶ 13-14.

During February and early March, 2009, Ion regularly told Vince Dressler when he left to go to the daycare for lunch.  Dressler never objected. R. 257 ¶ 15.

**Ogborn's Adverse Reaction to Ion's Long Lunch Hours.**  Unbeknownst to Ion, Ogborn had become irritated by Ion's long lunch hours.  Ogborn decided to ship Chevron's progressive disciplinary process (that normally began with an informal conference) and go directly to a Step Four suspension with a final warning.  R. 257 ¶

17. [1]

On March 11, 2009, Ogborn called Ion into a meeting and blindsided him the allegation that he was "stealing time" by taking long lunch hours.  R. 257 ¶ 19. Ogborn presented him with a printout of his long lunch breaks.  In a hostile tone, Ogborn said that long lunch breaks was a serious violation of Chevron's AWOL policies. R. 257 ¶ 19.

Ion was stunned. Ogborn had previously said nothing negative about the plaintiff's long lunch hours to be with his son. R. 258 ¶ 22. The plaintiff reminded Ogborn and Dressler that he was spending time with his son at the daycare during his lunch hour.  R. 257 ¶ 18.  Ogborn demanded proof that he had been going to the daycare.  R. 258 ¶ 20.

The following day, Ion produced copies of the sign in sheets from the day care to show he had been spending his lunch hour with his son.  R. 258 ¶ 21.  Even so, Ogborn said "the investigation" would continue.  R. 258 ¶ 21 or 23 ?

Ogborn's sudden change of attitude increased Ion's stress tremendously.  R. 258 ¶ 22.  Ion had thought he was on the cusp of getting some relief in his work schedule only to suddenly realize that his job was in jeopardy.

---

[1] Ogborn asked HR as early as 2/27/09 about taking strong disciplinary action against Ion for the long lunch breaks.  Ex. 3.  Ogborn's e-mail to HR stated that they are likely looking at a suspension [and] may want to go beyond suspension."  Ogborn requested a print out of the card logs to document Ion's long lunch breaks. R. 257 ¶ 16.

**Suspension**.  On March 16, 2009, Ogborn suspended Ion for five days without pay for *inter alia* taking long lunch breaks.[2]  Ogborn told Ion that his request for a leave or a modified schedule would not be discussed during his suspension R. 258 ¶ 26.  Ion responded that he still had a need to get some information from somebody about a modified work schedule or some leave.  Ogborn yelled in a hostile voice that Ion would have to ask the EAP (Employee Assistance Program) because "You are not getting it from me."  R. 258 ¶ 25.

**FMLA Leave.**  Ion followed up on Ogborn's statement to contact EAP to discuss leave.  He contacted Chevron's EAP Coordinator, Tina Taylor, and told her about the stress he was under.  R. 258 ¶ 27.[3]  She referred him to a license professional counselor in Mobile, Mr. Ronald Berman.  Ms. Taylor said that the sessions would be confidential and that Ion did not have to sign a general medical release.  R. 258 ¶ 28.

---

[2] Ogborn presented the plaintiff with Performance Improvement Plan. The PIP listed the items discussed previously on December 16, 2008.  R. 258 ¶ 24.

[3] And spoke with counselor Tina Taylor. Ion asked her "what does EAP do?"  She said that EAP helps employees going through tough times.  Ion said "that sounds like me."  He told her about his personal issues with his son, his wife, the emotional and financial stuff, the extra house and driving back and forth and burning myself out.  Ms. Taylor said "We can pull you from the workplace and send you to a license professional counselor for an evaluation."  She added, "your situation is exactly what this program if for.  We've got a program for you.  FMLA leave might be available."  R. 258 ¶ 27.

After Mr. Berman evaluated Ion, he faxed to Chevron on Tuesday, 3/24/09, an FMLA document certifying that the emotional, financial and psychological stressors in the plaintiff's personal and family life constituted a serious health condition under the FMLA.  R. 280 (Ex. 5); R. 261 ¶ 49; R. 259 ¶ 30, 32.

On Monday, March 23, 2009, Ion was scheduled to return to work after his suspension. However, he reported to Ogborn that he was under the care of an EAP counselor. R. 282 (Ex. 6); R. 259 ¶ 31.

On March 24, 2009, Ion called in sick and told Ogborn that he was working on paperwork for some kind of a disability.  Ogborn said to work with the nurses in the Chevron clinic on that.  R. 283 (Ex. 7); R. 259 ¶ 33.

**Chevron's Adverse Reaction.**  The general manager of the refinery, Chris Melcher, had a very negative assessment of Ion's motives.  In an email to Ogborn, Melcher said:

> It looks like Mr. Ion is playing games with us after his suspension. I assume the "paperwork for short-term disability" comment means he is looking for a doctor to give him some FMLA qualified time off. What are our options moving forward?

R. 285 (Ex. 8); R. 259 ¶ 34-35. Ogborn first said that he did not remember if he respond to his boss's request "for options."  He then said that he did not.  R. 305 (Ogborn dep 84).

**Medical Release.**  The next day, a nurse asked Ion to come to the clinic to sign a GO form 153.  R. 259 ¶ 37, 38.  Since he was on suspension, Ion was issued an

visitor's badge.  When Ion arrived at the clinic, he asked a nurse about the purpose of the form.  The nurse said it was a medical release that would allow Chevron to get copies of his medical records.  R. 259 ¶ 39.  Ion asked the nurse whether his boss could read his counselor's notes of his private counseling sessions if he signed the form.  The nurse said she was not allowed to answer any questions or give him any information.  She insisted that Ion sign the form.  R. 260 ¶ 40.

Ion told all the nurses that he was completely in the dark and needed some guidance on the purpose of the form.  He asked if the release was for short term disability or FMLA leave.  R. 260 ¶ 42.  Two other nurses told him that only Angela Fortney could answer his questions but that she was not available.  R. 260 ¶ 41.

Ion told the nurses that he was extremely frustrated by their request that he sign a form without explaining its purpose or ramifications.  Ion's frustration was compounded because he was getting conflicting information from Ms. Taylor in the EAP office about whether he had to sign the form.  R. 260 ¶ 40, 43.

One nurse told Ion to ask HR for some answers.  Ion then used a nearby phone to call Johnette Watson, the HR manager. R. 260 ¶ 44.  Ion asked her for a copy of any policy that explained GO form 153.  Watson gave him the numbers of several HR policies, but she would not give him copies of the policies themselves.  She said he had to ask his supervisor for copies.  Ion then went to Ogborn's office to ask him for copies of the policies.  R. 260 ¶ 44.

After reviewing the printed copies, Ion discovered that none of them explained GO form 153. Ion called Ms. Watson back, and she gave him two more policy numbers. Ion had to go back to Ogborn's office to get copies. The new copies did not explain form GO-153. R. 260 ¶ 45

Ion then decided to go the EAP office and talk to Ms. Taylor. One of the nurses escorted Ion to the EAP office. Ms. Taylor was not there, so the nurse escorted Ion back to the clinic. When they arrived, Ion saw Angela Fortney, the nurse who supposedly could answer Ion's questions. Ion told her he needed to ask her some questions about the difference in short-term disability, long-term and FMLA. R. 260 ¶ 46.

Fortney stood up and loudly demanded that Ion get out of the clinic. Ion was speechless, shocked and humiliated. He left the refinery and went home. He did not sign GO form 153. R. 260 ¶ 47.

Thereafter, Ogborn wrote a memo to the file stating that "Ion's demeanor, as described by the clinic employees, was passive/aggressive harassment and he made the clinic employees feel uncomfortable." They also said he "appeared disgruntled and angry and mentioned that he didn't trust them." R. 288 (Ex. 11); R. 261 ¶ 48.

**Report from James Peel.** The same day that Ion went to the clinic, co-worker James Peel told Ogborn on March 25, 2009, that *[on 3/11/09, the day he was blindsided with the printout of the card logs and the accusation that he was stealing time by taking long lunch hours]* Ion had said he could fake a nervous breakdown related to his divorce

so he could take leave of absence with FMLA and EAP benefits.   Peel added that Ion had boasted that he could get paid for being at home." Peel claimed that Ion had made the comment on March 11, 2009, which was after Ion had returned from the meeting where Ogborn had accused him of stealing time.  R. 290 (Ex.12); R. 261 ¶ 51.

Ogborn's report of this information to Chris Melcher, the refinery general manager, included some harsh comments that Ion was faking, bilking Chevron and committing criminal activity.

> It is clear to me that Todd is doing exactly what he told James he was going to do. … As for my recommendation, I think strong action should be taken since Todd has premeditatedly planned to fake an "illness" and bilk Chevron.  We don't need this type of criminal behavior at Chevron.

R. 290 (Ex. 12);  R. 261 ¶ 52.

Ion did not tell James Peel that he could or would fake an illness.  During casual conversations at lunch, Ion, Peel and other co-workers had had general conversations about all the things that some people do to fake back pain or whatever to get disability from the government.  R. 261 ¶ 53.

**Termination.**  On March 26, Ion advised Ogborn that he would be off work a month until approximately April 27.  R. 261 ¶ 54.  Shortly thereafter, Ion was terminated.

## V.  Course of Proceedings Below.

At the conclusion of the discovery, Chevron filed a motion for summary judgment.  The district court granted partial summary judgment.  R. 350-61. Chevron then file a second motion for summary judgment on the remaining claim. The district court granted that as well and dismissed the remaining claim.  R. 419. Judgment was entered on 8/1/09.  R. 422.  The plaintiff filed a timely notice of appeal.  R. 423.

## VI.   Summary of the Arguments.

Under the modified <u>McDonnel Douglas</u> analysis, Chevron had the legal burden to prove by a preponderance of the evidence that it would have fired the plaintiff even if the unlawful retaliatory motive is taken out of the equation.  Chevron offered no proof of what it would have done. The district court erroneously held that the same proof of good faith reliance that satisfied Chevron's burden at Step 2 also satisfied Chevron's burden at step four.

## VII.   Standard of Review

The plaintiff's factual argument (that the record contains no evidence of what Chevron would have done in the absence of an unlawful motive) subject to the clearly erroneous rule.  However, the remaining issues involve issues of law and, therefore, should be reviewed *de novo* by this Court.

## VIII. Arguments.

### *A. Mixed-Motive Case*.

In its motion for summary judgment, Chevron used the traditional three-step analysis under <u>McDonnel Douglas v Green</u>, 411 U S 792 (1973) to argue that (1) it articulated legitimate reasons to terminate Ion and (2) Ion had no proof of pretext.  R. 90-91, 225.

In his response, Ion argued that a mixed motive case had to be analyzed under the modified <u>McDonnell Douglas</u> analysis set for in R<u>ichardson v. Monitronics Int'l, Inc.</u>, 434 F.3d 327 (5th Cir. 2005).  R. 37.  The modified analysis has a fourth step that Chevron never addressed in its motion.  In its reply brief, Chevron argued that it should prevail even under a mixed motive analysis.  R. 323-24.

The district court agreed with Chevron and granted partial summary judgment on the retaliation claim.  R. 350-61.  The district court may have assumed that Chevron had not moved for summary judgment on all claims.  During a telephone conference (Minute Entry 4/18/12), the parties advised the court that the decision had effectively disposed of both claims.  To keep the record clear, the district court suggested that Chevron file a second motion for summary judgment on the interference claim.  Chevron did so, R. 362, and the district court granted that motion

in a short opinion.  R. 419-21.  Final judgment was entered on 8/1/12. R. 422.  The

plaintiff timely filed a notice of appeal on 8/29/12.  R. 423.

To articulate a reason for terminating the plaintiff at Step 2 of the <u>McDonnell</u>

<u>Douglas</u> analysis, Chevron noted that its termination letter listed several reasons for

terminating Ion.

(1) the failure to return to work after his suspension.
(2) his previous AWOL,
(3) performance deficiencies,
(4) the indication of anger to his office mate, James Peel, and
(6) his telling Peel that he could fake an illness and take leave with pay,

R. 221; R. 294.

Chevron added another reason in its memo, i.e.,  a report from the nurses in

the plant clinic that Ion had made them feel uncomfortable.  R. 231-32.

The district court correctly recognized that the first reason noted above made

this a mixed motive case.  R. 360.  That reason was an arguable FMLA violation.

Chevron's letter said that one reason for terminating Ion was the fact that he had not

return to work after his suspension.  That fact made this a mixed-motive case.  Ion

did not return to work after the suspension because he had gone on leave for a

serious health condition as defined by the FMLA. R.  259 ¶ 30, 32, 49.  Under the

FMLA, Chevron could not take adverse action against Ion for taking FMLA leave.[4]

---

[4] The termination letter stated *inter alia* that Ion had not returned to work on March
23 after his suspension ended on March 19. R. 220.   He did not return because he
was on an FMLA qualifying leave. R. 280.  Hence, Ion's termination was based in part
on an unlawful reason.

Hence, the district court correctly treated this as a mixed motive case.[5] The district court also properly identified the pivotal issue as whether Chevron proved that it would have terminated Ion for other reason. The district court then erred in finding that Chevron proved that affirmative defense.

### B. Proof of the Affirmative Defense: Reliance on Reports.

In a mixed-motive case, the unlawful motive is taken out of the equation. Then the employer must prove by a preponderance of the evidence that that it still would have terminated the plaintiff for other reasons.

After taking Ion's FMLA leave out of the equation, the district court found that Chevron proved that it still would have fired Ion based on reports received from co-workers after Ion had taken the leave. R. 231-32. The district court noted that after Ion had gone on FMLA leave, Ion's supervisor received two reports from co-workers that concerned him. Specifically, one report was from a co-worker who said that Ion had said that he could have faked a nervous breakdown and gone on FMLA leave with pay. The other coworkers (nurses) reported that Ion had made them feel uncomfortable. R. 288.

---

[5] "The traditional <u>McDonnell Douglas</u> framework does not always apply in FMLA retaliatory discharge cases, however. The mixed motive framework applies to cases in which the employee concedes that discrimination was not the sole reason for her discharge, but argues that discrimination was a motivating factor in her termination." <u>Richardson</u>, 434 F.3d 327, 333 (5th Cir. 2006)

The district court noted that "[a]lthough Ion [disputes the statements made by his co-workers], the proper inquiry is whether Chevron reasonably believed and relied upon the information received from these employees in good faith." R. 361.  The district court found that Chevron had relied in good faith on those reports and "[t]hus, Chevron has shown that it would have terminated Ion even if he had not applied for FMLA leave."  R. 361.  Thus, the district court found that Chevron proved the affirmative defense.

The district court relied on <u>Jackson v Cal-Western Packaging Corp.</u>, 602 F 3d 374, 379 (5th Cir. 2010) for the proposition that the employer's articulation of a good faith reliance is sufficient to prove the employer's affirmative defense that it would have terminated Ion based on those reports even if Ion had not taken FMLA leave. R. 361.

The district court erred as a matter of fact and as a matter of law in holding that "good faith reliance" proved Chevron's affirmative defense.

As a matter of fact, it was error because reliance on the reports (satisfied Chevron's burden at Step 2 but) was not even probative of the affirmative defense at Step 4.  As a matter of law, it was error because the reports from co-workers were independent violations of the FMLA and could not be considered as a part of Chevron's affirmative defense.

In a common scenario in Title VII cases (like <u>Jackson</u>), an employer will claim that it relied on information in terminating a plaintiff. Articulating such a reason is

enough to satisfy the employer's burden at Step 2. At Step 3, an employee will try to prove pretext by showing that the employer's reason is false or exaggerated. However, if the employer can show that it relied on the information in good faith, that information – *even if disputed or erroneous* - is enough to defeat the employee's showing of pretext and gain summary judgment for the employer.

A mixed-motive case has a new dimension. The modified <u>McDonnell Douglas</u> framework was articulated by this Court as follows:

> Within the mixed-motive framework:
>
> (1) the employee must make a *prima facie* case of discrimination;
>
> (2) the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action; and
>
> (3) the employee must offer sufficient evidence to create a genuine issue of fact either that
>
> **(a)** the employer's proffered reason is a pretext for discrimination, or
>
> **(b)** (and herein lies the modifying distinction) that the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination.
>
> [4] If the employee proves that discrimination was a motivating factor in the employment decision, the burden again shifts to the employer, this time to prove that it would have taken the same action despite the discriminatory animus. **The employer's final burden is effectively that of proving an affirmative defense.**

<u>Richardson vs. Monitronics Int'l, Inc.</u>, 434 F.3d 327, 333 (5th Cir. 2005)(emphasis added).

Reliance on Jackson was clear error.  However, Jackson was not a mixed-motive case so it never reached the Step 4 analysis.  While the good faith reliance was sufficient at Step 2 in Jackson to satisfy the employer's light burden and defeat the employee's showing of pretext at Step 3, it is not even probative much less dispositive at Step 4 where Chevron must prove that the reported misconduct was so serious that Chevron would have terminated Ion for that reason.  Good faith reliance can satisfy the employer's burden at Step 2 but it is not sufficient at Step 4 to prove the affirmative defense in a mixed motive analysis. [6]

The issues at Steps 2 and 4 are obviously different.   Step 2 does not consider the gravity of the employee's offence.  Hence, the articulation of even a minor reason - *however slight or insignificant* – is enough to satisfy the employer's light burden and shift the burden of proof to the employee to prove pretext.  However, the gravity of the offense is critical at Step 4 because the employer must prove that the misconduct was serious enough to be a firing offense.

In other words, Chevron's articulation of several reasons at Step 2 to justify Ion's firing does not prove that any one of them - *standing alone* - is a firing offense that would have resulted in Ion's termination.  While, the district court noted that the

---

[6] At Step 2, the employer's burden is light; it merely has to articulate - *not prove* – it a reason.  The burden then shifts to the employee who must prove - not just articulate - at Step 3 that the employer's articulated reason is a pretext.  At Step 4, the employer must prove its affirmative defense by a preponderance of the evidence.

reports from the co-workers was a "cause for concern" to Ion's supervisor, the existence of a "concern" does not prove that the concern was so great that Ion would have been fired.[7]

Just because the reports from co-workers were accepted at face *(and became part of the mix of reasons cited by Chevron for firing Ion)* does not mean that the reports - *standing alone* - would have resulted in Ion's termination.

Restated:  the nature of the burden is different at Step 4.  At Step 4, the employer must do more than show ***what it did*** (relied on reports in good faith). Instead, the employer must prove retrospectively what it ***would have done*** – if the FMLA reason is removed from the equation.

Finally, the district court seemed to have improperly placed a burden on Ion at Step 4 to show bad faith.  "The district court stated that "Ion provides no evidence that Chevron's reliance on the reports of these employees was in bad faith.  Thus, Chevron has shown it would have terminated Ion even if he had not applied for FMLA leave." R. 361.  Ion had no burden to show bad faith or anything else at Step 4.

---

[7] Articulating a reason at Step 2 is not the same as proving that the reason was a firing offense at Step 4.  "As to the employer's proof, in most cases, the employer should be able to present some objective evidence as to its probable decision in the absence of an impermissible motive. Moreover, proving that the same decision would have been justified … is not the same as proving that the same decision would have been made." Hopkins v. Price Waterhouse,  490 U S 228, 252, 109 S. Ct. at 1791 (plurality opinion) quoted in part in  McKennon v. Nashville Banner,  513 U.S. 352, 360.

As a matter of law, the district court erred in holding that Chevron proved its affirmative defense on summary judgment by just articulating that it had accepted at face value the reports of misconduct from coworkers.

## C. Evidence Necessary to Prove the Affirmative Defense.

The proof of what Chevron would have done can only be shown by its past track record of disciplining other employees for similar offenses.[8]  For example, in Richardson vs. Monitronics Int'l, Inc., 434 F.3d 327 (5th Cir. 2005), this Court held that Monitronics had carried its burden of proving with evidence that it had a standard practice of terminating employees with four occurrences.  "Most significantly, the attendance policy undeniably specifies that four 'occurrences' result in termination. Richardson acquired more than enough 'occurrences' to justify her termination under the policy."  Id. at 336.

Chevron could have proven "what would have happened" with evidence of Chevron's track record on disciplining similar situations of equal seriousness. Chevron did not even offer a self-serving affidavit from a decision maker speculating that he or she would have fired Ion based on the reports standing alone.

---

[8] The appellant concedes that the affirmative defense could also be shown - even in the absence of a track record on a particular offense - where the employee's offense was so egregious that as a matter of common sense and reasonable inference, it can be concluded that the employee would have been terminated.

The employer has a similar burden to prove "what it would have done" in after-acquired evidence cases.[9] Such a defense also requires proof of a track record. " [T]he employer . . . must show that such a firing would have taken place as a matter of "settled" company policy.' " Murillo v. Rite Stuff Foods, Inc. 65 Cal.App.4th 833, 842, 77 Cal.Rptr.2d 12 (1998).

The record is empty of what Chevron would have done. The argument of counsel that Chevron would have fired Ion based on the reports from coworkers rings hollow in the empty record. With no proof that Chevron would have fired Ion, the finding by the district court that Chevron proved its affirmative defense is not supported by anything in the record. Hence, it was error to grant Chevron's motion on this record.

### D. The Reports Involved Independent FMLA Violations.

Even if Chevron had proven a track record of terminating employees based on similar reports, it was still error for the district court to grant summary judgment to Chevron. The reports from the co workers involved FMLA violations, and therefore could not - as a matter of law - be considered as a part of the affirmative defense.

---

[9] In after-acquired evidence cases, an employer can show that it would have never hired or fired a plaintiff if it had known at the time of particular evidence of wrongdoing. "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 362-363, 115 S.Ct. 879, 130 L.Ed.2d 852, (1995).

Hence, it was error for the district court to rely on them in holding that Chevron had proven its affirmative defense.

    **1. The First Report.** The reports from the co-workers both came on March 25, the third day of Ion's FMLA leave. The first report was from James Peel who alleged that Ion had said he could fake the need for FMLA leave. R. 287. The day before getting Peel's report, the general manager of the refinery, Chris Melcher, set the tone for management's reaction to Ion taking FMLA leave. Melcher said in an email that Ion was "playing games" and "doctor shopping" for FMLA leave. R. 285.[10]

> It looks like Mr. Ion is playing games with us after his suspension. I assume the "paperwork for short-term disability" comment means he is looking for a doctor to give him some FMLA qualified time off. ***What are our options moving forward ?***

R. 285 (emphasis added). Ogborn first said that he did not remember if he had responded to his boss' request for options. He then said that he did not respond. R. 305 (Ogborn dep. 84).

    The next day, Peel reported to Ogborn that two weeks earlier (on 3/11/09) Ion had said that he could fake the need for a leave. R. 287. Ogborn immediately recommended to Melcher that strong action be taken against Ion for premeditatedly faking the need for leave, bilking Chevron out of money and engaging in criminal activity. R. 290.

---

[10] Ion was summoned to the plant that day by a nurse who ask him to sign a release. R. 259 ¶ 39.

> It is clear to me that Todd is doing exactly what he told James he was going to do. … As for my recommendation, I think strong action should be taken since Todd has premeditatedly planned to fake an "illness" and bilk Chevron. **We don't need this type of criminal behavior at Chevron.**

R. 290 (emphasis added).

Melcher in turn asked the Refinery Leadership Team (RLT), a team of refinery executives, to terminate Ion. R. 297 (Watson dep. 50). Melcher directed Watson to draft a termination letter. R. 297 (Watson dep. 51). Ogborn delivered the termination letter on April 2. R. 294.

This sequence of events shows that the report from Peel lead directly to Ion's termination based on the assumption that he was faking the need for the leave. Chevron accepted Peel's report at face value and assumed that Ion was faking the need for leave.

However, once Chevron received the FMLA certificate from the healthcare provider on March 24, R. 280, it could no longer act based on the assumption that Ion was faking the need for a leave. If Chevron doubted the validity of Ion's need for FMLA leave, its only recourse under the FMLA was to obtain a another opinion from a second healthcare provider of its choosing. 29 USC 2613(c); 29 CFR 307§825(b) and (b)(2). Interestingly, the first healthcare provider was selected by Chevron's EAP coordinator. R. 258 ¶ 27-28. Accordingly, Melcher's assumption that Ion was "doctor shopping" is just not true.

Firing Ion based on report from co-worker James Peel is evidence of an FMLA violation. Hence, that evidence cannot be considered as a part of Chevron's affirmative defense.

**2. The Second Report.** The nurses allegedly told Ogborn that Ion had made them feel uncomfortable. R. 288.[11] If Ion made the nurses feel uncomfortable, it was in the context of their own violation of the FMLA and Ion's opposition to their unlawful request that he sign a general medical release.

The nurses unlawfully asked him to sign a medical release. While an employer can require a certificate from a health care provider, the FMLA prohibits an employer from asking for more information or for a release. Ion's counselor had already submitted a certificate documenting his serious health condition. Chevron then asked Ion to also sign a general medical release on Chevron form GO-153.[12] The nurses then called Ion and asked him to come to the plant clinic to sign a release. The

---

[11] First off, the report from the nurses was not significant enough for Ogborn to even mention it in his termination letter. R. 294. Ogborn's memo to the file says that Ion made them feel uncomfortable. R. 288. In its reply brief, Chevron attached a declaration from a security guard who said that he did a threat assessment of Ion's behavior by re-interviewing the nurses. He said that Ion's "behavior gave rise to concerns of workplace violence. R. 343-44. Chevron has since referred to it as a workplace violence issue. R. 231-32, 324.

[12] As a condition to taking FMLA leave, an employer can require an employee to submit a certification from a health care provider. 29 CFR § 825.306(a). In lieu of submitting a certificate, an employee has the option of giving an employer a release. However, an employer cannot require a release. "[T]he employee may not be required to provide such an authorization, release, or waiver." 29 CFR 825.306 (c).

purpose of the release was to certify his absence as an FMLA leave on Chevron form GO-153 according to the HR manager, Johnette Watson.  R. 298, 300 (Watson dep. 54, 61).  Watson admitted that she had no training in the FMLA.  R. 295 (Watson dep. 45-46).

That request was a *per se* violation of the FMLA.  Employer's are prohibited from asking for more information beyond the certification.  "If an employee submits a complete certification signed by the health care provider, ***the employer may <u>not</u>*** ***request additional information from the employee's heath care provider***."  29 CFR 825. 307(a)(emphasis added).  "[H]owever, no information may be required beyond that specified [in the FMLA regs]."  29 CFR § 825.306(b).

Ion's refusal was protected activity under the FMLA's opposition clause.  "It shall be unlawful for any employer to discharge our in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  29 USC § 2615(a)(2).

Ion complied with the nurses' request that he come to the refinery during his suspension.  R. 259 ¶ 37-40.  When Ion arrived at the plant clinic, the nurses asked him to sign a release.  Ion asked them several questions about whether the release was for FMLA leave or short term disability or both. Ion also wanted to know if signing the release would allow his boss to read his counselor's notes of his private counseling sessions. The nurses said they could not answer his questions.  R. 260 ¶ 40.  Ion then sought answers from other Chevron personnel including his supervisor, Steve

Ogborn, and the HR manager, Johnette Watson.  He also looked for the EAP

counselor to ask them same question.   R. 260 ¶ 45.

When nobody at the plant would or could answer his questions, the head nurse

then asked Ion to leave the premises.  R. 260 ¶ 47.  The nurses then reported to

Ogborn that Ion had made them feel uncomfortable.  R. 288.  Ion never did sign the

release. R. 260 ¶ 47.

Chevron's failure to answer his questions was interference with his FMLA

rights.  Employers are expected to responsibly answer questions from employees

concerning their rights and responsibility under the FMLA. §825.300(c)(5).  If Ion's

persistent questions made the nurses feel uncomfortable, it was in the context of his

exercise of his FMLA rights and the nurses' interference with his FMLA rights. Ion

had a right to ask questions and the nurse had an obligation to answer his questions.

The nurses violated the FMLA by even asking the plaintiff to sign a general

medical release.  They further interfered with his FMLA rights by not answering his

questions about the release.

Watson testified that one reason for firing Ion was the fact that he refused to

sign the medical release.  R. 300 (Watson dep 61).  Ion's opposition to that unlawful

request was protected under the opposition clause – even if it made nurses feel

uneasy. "Opposition" claims under are not common in FMLA cases.  29 USC

2615(a)(2).

The employer can ask for additional information under some circumstances if workers comp and/or a disability plan requires a release. [13] "If the employee fails to provide the information required for receipt of such payments or benefits, such failure will not affect the employee's entitlement to take unpaid FMLA leave." 29 CFR  825.306(c).

Since both reports from the co-workers involved independent FMLA violations, those reports could not be considered in a mixed motive case.  The district court erred in relying on them as a part of Chevron's affirmative defense.

### IX.  Conclusion.

The appellant request this Court to vacate the judgment below and remand this case to the lower court for trial on the merits.

Dated:  December 10, 2009.

---

[13] If the purpose of asking Ion to sign a release was to process an application for short term disability, the FMLA allows a request for that purpose provided it is explained to the employee.   An employer can ask for a release in accordance with a short-term disability plan "provided that the employer informs the employee that the additional information only needs to be provided in connection with receipt of such payments of benefits." 29 CFR 825.306(c).

If a workers' compensation statue permits an employer to request additional information from the healthcare provider, FMLA does not prohibit.  Similarly, an employer may request additional information in accordance with a paid leave policy or disability plan that requires greater information to qualify for payments or benefits, Any information received pursuant to such policy or plan may be considered in determining the employee's entitlement to FMLA protected leave.  29 CFR 825.306(c).

Respectfully submitted,

*/s/MikeFarrell*
Mike Farrell
Miss. Bar No. 5147

Mike Farrell, PLLC
Regions Plaza, Suite 2180
210 Capitol Street
Jackson, MS  39201
601-948-8030 Tel


CERTIFICATE OF SERVICE

I certify that on December 10, 2012, two paper copies and one electronic copy of this brief were served by U. S. Mail upon:

Patrick Buchanan
Brown Buchanan, PA
P. O. Box 1377
Biloxi, MS 39533
mailb@brownbuchanan.com


*/s/MikeFarrell*
Mike Farrell


CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(A)(7) FRAP, I hereby certify that this brief contains 7,254 words and that it is proportionally spaced and typed in 14 point Garamond font.


*/s/MikeFarrell*
Mike Farrell